NOSSAMAN LLP
Paul S. Weiland (SBN 237058)
Benjamin Z. Rubin (SBN 249630)
Christopher D. Hughes (SBN 254864)
621 Capitol Mall, Suite 2500
Sacramento, CA 95814
Telephone: (916) 442-8888
Facsimile: (916) 442-0382
pweiland@nossaman.com
brubin@nossaman.com
chughes@nossaman.com

KELLEY DRYE & WARREN LLP
David E. Frulla (*pro hac vice*)
Bret A. Sparks (*pro hac vice*)
Bezalel A. Stern (*pro hac vice*)
3050 K Street NW, Suite 400
Washington, DC 20007
Telephone:  (202) 342-8400
Facsimile:  (202) 342-8451
dfrulla@kelleydrye.com
bsparks@kelleydrye.com
bstern@kelleydrye.com

*Counsel for Plaintiffs April in Paris, et al.*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APRIL IN PARIS, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ROB BONTA, *et al.*,<br><br>        Defendants. | Civil Case No. 2:19-cv-02471-KJM-CKD<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:       March 4, 2022<br>Time:      10:00 a.m.<br>Crtrm:    3<br>Before:   Hon. Kimberly J. Mueller |
| LOUISIANA WILDLIFE AND FISHERIES COMMISSION, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ROB BONTA, *et al.*,<br><br>        Defendants. | Civil Case No. 2:19-cv-02488-KJM-CKD |

1

## <u>TABLE OF CONTENTS</u>

2

Page(s)

3

I.      INTRODUCTION.................................................................................................1

4

II.     PROCEDURAL BACKGROUND ......................................................................2

5

III.    STATEMENT OF FACTS...................................................................................3

6

IV.     LEGAL STANDARD ..........................................................................................6

7

V.      ARGUMENT .......................................................................................................6

8

        A.      ESA's Implementing Regulations Contain a Specific "Exemption" for
                Threatened CITES Appendix II-Listed Species, Including these Alligators

9

                and Crocodiles ...........................................................................................7

10

        B.      Defendant-Intervenors' Arguments Regarding 16 U.S.C. § 1539 Are a Red

11

                Herring ....................................................................................................10

12

        C.      The Provision Requiring Adherence to "the Laws and Regulations of the
                State of Sale or Transfer" at 50 C.F.R. § 17.42(a)(2)(ii)(B) Holds the Same

13

                Meaning as the Similar Provision Found in Man Hing's Elephant Permits ........11

14

        D.      This Court Should Refrain From Deciding Any Motion For Summary
                Judgment Until a Final Decision is Reached on FWS's Proposed Rule..............16

15

VI.     CONCLUSION ..................................................................................................17

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................ 6

*Celotex Corp. v. Cattrett*,
    477 U.S. 317 (1986) ............................................................................................ 6

*City of Charleston v. A Fisherman's Best*,
    310 F.3d 155 (4th Cir. 2002) ............................................................................ 16

*Fouke Co. v. Brown*,
    463 F. Supp. 1142 (E.D. Cal. 1979) ............................................................ 1, 6, 13, 15

*Government of Guam v. Guerrero*,
    11 F.4th 1052 (9th Cir. 2021) ........................................................................... 15

*H.J. Justin & Sons, Inc. v. Brown*,
    702 F.2d 758 (9th Cir. 1983) ......................................................................... 2, 15

*Man Hing Ivory and Imports, Inc. v. Deukmejian*,
    702 F.2d 760 (9th Cir. 1983) .................................................................... *passim*

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................................ 6

*In Re Polar Bear Endangered Species Act Listing*,
    818 F. Supp. 2d 214 (D.D.C. 2011) ............................................................. 10, 11

*Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*,
    1 F.3d 1 (D.C. Cir. 1993) .................................................................................. 10

## Statutes

16 U.S.C. § 1533 ............................................................................................... 10, 11

16 U.S.C. § 1535 ................................................................................................ *passim*

16 U.S.C. § 1537a ................................................................................................... 2

16 U.S.C. § 1538 ............................................................................................... 10, 11

16 U.S.C. § 1539 ........................................................................................... 9, 10, 11

California Penal Code Section 653o ................................................................. *passim*

California Penal Code Section 653r ................................................................... 1, 11

**Regulations**

50 C.F.R. § 10.3 ............................................................................... 12, 13, 14, 15

50 C.F.R. § 17.8 ............................................................................... 7, 8, 9, 11

50 C.F.R. § 17.31 ............................................................................... 8, 9

50 C.F.R. § 17.32 ............................................................................... 7, 8, 9

50 C.F.R. § 17.40 ............................................................................... 9, 12

50 C.F.R. § 17.42 ............................................................................... *passim*

50 C.F.R. § 23.5 ............................................................................... 9

50 C.F.R. § 23.20 ............................................................................... 9

50 C.F.R. § 23.36 ............................................................................... 10

50 C.F.R. § 23.37 ............................................................................... 10

**Other Authorities**

40 Fed. Reg. 44412 (Sept. 26, 1975) ................................................... 13

42 Fed. Reg. 2071 (Jan. 10, 1977) ...................................................... 13

44 Fed. Reg. 37130 (June 25, 1979) .................................................... 13

44 Fed. Reg. 59080 (Oct. 12, 1979) ..................................................... 14

45 Fed. Reg. 78153 (Nov. 25, 1980) .................................................... 14

46 Fed. Reg. 40664 (Aug. 10, 1981) .................................................... 14

51 Fed. Reg. 19760 (June 2, 1986) ...................................................... 15

52 Fed. Reg. 21059 (June 4, 1987) ...................................................... 14

72 Fed. Reg. 48402 (Aug. 23, 2007) .................................................... 15

84 Fed. Reg. 44753 (Aug. 27, 2019) .................................................... 10

86 Fed. Reg. 5112 (Jan. 19, 2021) ................................................ 15, 16, 17

Letter from Douglas P. Wheeler to John D. Dingell (June 13, 1973), Hearings on
  Endangered Species before the Subcomm. on Fisheries and Wildlife
  Conservation and the Environment of the H. Comm. on Merchant Marine
  Fisheries, 93rd Cong. (1st Sess. 387) ............................................... 16

Fed. R. Civ. P. 56(c) ........................................................................ 6

Fed. R. Civ. P. 25(d)...........................................................................................................................1

S. Rep. No. 93–307 (1973), 1973 U.S.C.C.A.N. 2989 .................................................................11

Plaintiffs April in Paris; AMTAN Louisiana; Brooks Family Alligator Farm II; Hogwards Carry Goods d/b/a Chester Mox; Bijan Boutiques, LLC d/b/a House of Bijan; La Duchesse, Ltd.; Larson Leather Company; Louisiana Alligator Farmers & Ranchers Association; Magna Leather Corporation; M&D Gator Products, Inc.; and SELMINT Pty Ltd. (hereafter "Plaintiffs"), by and through undersigned counsel, respectfully submit this Memorandum in Support of their Motion for Summary Judgment.  This Memorandum is directed to the merits of Plaintiffs' Supremacy Clause Count I, pursuant to the Parties' Joint Status Report (ECF 49).  For the reasons set forth herein, Plaintiffs respectfully ask this Court to declare California Penal Code Sections 653o and 653r unconstitutional as they pertain to prohibiting trade in the parts and products of CITES Appendix II-listed American alligators (*Alligator mississippiensis*), Nile crocodiles (*Crocodylus niloticus*), and saltwater crocodiles (*Crocodylus porosus*), and to continue application of the preliminary injunction issued by this Court on October 13, 2020 (ECF 48 at 16), against Defendants, the Honorable Rob Bonta, in his official capacity as Attorney General of California, and Charlton Bonham, in his official capacity as Director of the California Department of Fish and Wildlife (collectively, "Defendants"), and their employees, agents, and successors in office, pending final resolution of this case.  For the reasons explained below, Plaintiffs' Motion should be granted.

## I.    INTRODUCTION

The Court's October 13, 2020 Opinion and Order ("Order") closely tracks the facts, applicable precedent and, with two exceptions described below, the Endangered Species Act ("ESA") and its applicable regulations.  In summary, the Court concluded Plaintiffs were likely to prevail on their claims relating to trade in California in certain Nile and saltwater crocodiles, and had presented a serious question, under applicable Ninth Circuit injunction standards, as to American alligators.  Order at 15.  Largely for the reasons already set forth in its Order, the Court should proceed to grant summary judgment for Plaintiffs regarding their Count One Supremacy Clause claims as to both the relevant alligator and crocodile species.

Most basically, the Court recognized that the permanent injunction issued as to American alligators in *Fouke  Co. v. Brown*, 463 F. Supp. 1142 (E.D. Cal. 1979), remained in place, and that

Defendants bear the burden to demonstrate why it should not remain in effect.  Order at 8.  The Court also recognized *Man Hing Ivory and Imports, Inc. v. Deukmejian*, 702 F.2d 760 (9th Cir. 1983), and *H.J. Justin & Sons, Inc. v. Brown*, 702 F.2d 758 (9th Cir. 1983), as applicable Ninth Circuit precedent.  Order at 9-11.  While these two cases involve African elephant products, they stand as precedent to preclude Penal Code Section 653o's application to threatened species traded pursuant to the Convention on International Trade in Endangered Species of Flora and Fauna ("CITES") regime, which is implemented in the United States via the ESA at 16 U.S.C. § 1537a.

Plaintiffs now focus their arguments here on two concerns the Court posited in the Order. This Court's first concern focused on "whether the species at issue are covered by the exemption contemplated by [ESA] § 1535(f)."  Order at 11.  As explained below, the regulations implementing the ESA contain a specific "exemption" for CITES Appendix II-listed species.  Such "exemption" expressly includes the alligators and crocodiles at issue.  Intervenors' attempts to lead this Court down an alternate path are flawed.  The ESA provisions that Intervenors rely upon are applicable to species listed as "endangered" under the ESA, and have no bearing on federal management of species listed as "threatened based on similarity of appearance" – as all three crocodilian species at issue here are classified.

This Court's second concern focused on whether to apply *Man Hing*'s interpretation of limited state deference, based on the wording of the African elephant permits, to the alligator special rule at 50 C.F.R. § 17.42(a)(2)(ii)(B).  Specifically, the Court expressed concern that this case may not be "directly analogous" to *Man Hing*.  However, the in-depth review of the regulatory history included below demonstrates that the provision at issue in the alligator special rule was formed from the same authority and for the exact same purposes as the permit language in *Man Hing*.

## II.   PROCEDURAL BACKGROUND

On December 10, 2019, Plaintiffs filed a Complaint in this Court, alleging that certain provisions relating to California Penal Code § 653o(b) ("Section 653o(b)") violate, *inter alia* the U.S. Constitution's Supremacy Clause, Commerce Clause, and Due Process Clause.  ECF 1.  On December 13, 2019, Plaintiffs submitted an Amended Complaint to add SELMINT Pty Ltd. as a

**Memorandum of Law in Support
of Motion for Summary Judgment**              2

Plaintiff.   ECF 8.   On December 16, 2019, Plaintiffs filed a Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction to enjoin Section 653o(b)'s enforcement prior to its implementation on January 1, 2020.   ECF 13.   On December 20, 2019, Defendants stipulated to a Temporary Restraining Order pending a decision on Plaintiffs' Motion for Preliminary Injunction.   ECF 29.   On December 23, 2019, this Court granted such Order.   ECF 30.

On February 7, 2020, Defendant-Intervenors the Center for Biological Diversity, the Humane Society of the United States, and the Humane Society International ("Intervenors") filed a Notice of Motion and Motion to Intervene.   ECF 31.   Plaintiffs opposed Intervenors' Motion to Intervene on February 21, 2020 (ECF 32), and a hearing was held on March 6, 2020 (ECF 35).   On March 3, 2020, the United States filed for *Amicus* status.   ECF 34.   On March 10, 2020, this Court granted the United States *Amicus* status (ECF 36), and on May 12, 2020, this Court granted Intervenors' Motion to Intervene (ECF 43).

Following full briefing on Plaintiffs' Motion for Preliminary Injunction (ECF 37, 38, 45, and 46), the Court held a hearing on the Motion on June 5, 2020 (ECF 47).   On October 13, 2020, the Court granted Plaintiffs' Motion for Preliminary Injunction, enjoining Defendants from enforcing Section 653o(b) pending a final disposition on the merits.   ECF 48.   In that same Order, this Court consolidated the current case with *Louisiana Wildlife and Fisheries Commission, et al. v. Becerra*, 2:19-cv-02488-KJM-CKD.   *Id.*

Plaintiffs now file this timely motion for summary judgment on Count I of their Complaint.

### III.   <u>STATEMENT OF FACTS</u>

Plaintiffs represent a broad cross section of the supply chain for trade in alligators, crocodiles, and their parts and products.   "As points in the supply chain for alligator and crocodile skin products, plaintiffs variously raise crocodilians from eggs, purchase and process their bodies for skin and meat, tan and craft the skins into leather, manufacture the skins into a range of leather goods and sell these products at retail."   Order at 4; Plaintiffs' Statement of Material Facts ("PSMF"), ¶ 1.

Certain plaintiffs, including La Duchesse, Ltd. (ECF 14-6) and Bijan Boutiques, LLC (ECF

14-5), imported into California for commercial purposes products made from American alligators and/or CITES Appendix II-listed Nile and/or saltwater crocodiles before January 1, 2020, are continuing to do so, and desire to continue to do so.  PSMF, ¶ 4.

Certain plaintiffs, including La Duchesse, Ltd. (ECF 14-6), Bijan Boutiques, LLC (ECF 14-5), April in Paris (ECF 14-1), and Hogwards Carry Goods (ECF 14-4), possessed with the intent to sell, and sold within California products made from American alligators and/or CITES Appendix II-listed Nile and/or saltwater crocodiles, before January 1, 2020, are continuing to do so, and desire to continue to do so.  PSMF, ¶ 5.

Certain plaintiffs, including Magna Leather Corporation (ECF 14-9) and Larson Leather Company (ECF 14-7), sold products made from American alligators and CITES Appendix II-listed Nile and/or saltwater crocodiles into California from outside the state before January 1, 2020, are continuing to do so, and desire to continue to do so.  PSMF, ¶ 6.  Plaintiff SELMINT Pty Ltd. (ECF No. 14-1) sold products made from CITES Appendix II-listed Nile and/or saltwater crocodile into California from outside the country before January 1, 2020, is continuing to do so, and desires to continue to do so.  *Id*.

Plaintiffs, including Brooks Family Alligator Farm II (ECF 14-3), Louisiana Alligator Farmers & Ranchers Association (ECF 14-8), AMTAN Louisiana (ECF 14-2), Magna Leather Corporation (ECF 14-9), Larson Leather Company (ECF 14-7), La Duchesse, Ltd. (ECF 14-6), Bijan Boutiques, LLC (ECF 14-5), April in Paris (ECF 14-1), Hogwards Carry Goods (ECF 14-4), M & D Gator Products, Inc. (ECF 14-10), and SELMINT Pty Ltd. (ECF 14-1) will have, and some already have had, their businesses negatively impacted economically by Section 653o(b)'s prohibitions.  PSMF, ¶ 7.

Economic harms to these Plaintiffs include, without limitation, direct loss of sales, loss of business opportunities, loss of business relationships and goodwill, loss of specialized jobs and non-transferability of operations more generally, threat of dissolution, and the need to relocate. (*See generally* ECF 48 at 16-17).  PSMF, ¶ 8.

Section 653o(b) takes aim at a federally-authorized, economically viable, and internationally

renowned conservation-oriented global industry.  If allowed to take effect, Section 653o(b) would not only severely damage Plaintiffs, *id.* at ¶ 7 (and supporting declarations), but, on a broader scale, destabilize the entire industry by harming all levels of the supply chain.

Per the statutory provision, Section 653o(b) was set for implementation on January 1, 2020. The parties stipulated to a Temporary Restraining Order, which this Court issued on December 23, 2019.  ECF 30.  Following full, substantive briefing by all of the parties and intervenors, the Court issued its Order granting Plaintiffs' Motion for Preliminary Injunction on October 13, 2020.  ECF 48.  In granting Plaintiffs' Motion, this Court found that the balance of all four preliminary injunction factors tilt sharply in favor of Plaintiffs.

First, the Court determined that "Plaintiffs raise serious questions in arguing the merits of their preemption argument." Order at 8. In doing so, the Court found that, at the preliminary injunction stage, "plaintiffs have shown a likelihood of success on their position as to the Nile and saltwater crocodiles and raised at least serious questions as to the American alligator." *Id.* at 15.

The Court then found that the three remaining preliminary injunction factors also favored Plaintiffs.  As to likelihood of injury, the Court determined that, because "there would be no way to remedy after the fact the harms plaintiff would suffer without an injunction . . . plaintiffs have shown they are likely to suffer an irreparable injury." *Id.* at 17.  The Court next determined:

> Because defendants' alleged harms consist primarily of damage to their prospective ability to advance their policy goals, rather than harm to the *status quo ante*, and because plaintiffs have demonstrated a likelihood of serious and far-reaching harm to their businesses and the managed conservation scheme they describe, the balance of hardships tips sharply in favor of the plaintiffs.

*Id.* at 18.  Finally, the Court found that public policy, too, is on Plaintiffs' side, explaining:

> [T]he question is not which policy better protects animals, but whether state or federal law controls. Although California has its own interest in protecting animals, the reach of that interest ends where the preemptive effect of federal law begins.  Because plaintiffs make a strong showing of preemption, the court finds the public interest weighs in their favor.

*Id.* at 19.

Pursuant to the Joint Status Report (ECF 49), Plaintiffs proceed only to address the merits of their Count I.   However, for the reasons this Court has already determined, Plaintiffs have satisfied the remaining factors necessary for a permanent injunction.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010) (standards are irreparable harm, inadequate remedies available at law, balance of hardships, and public interest).  Plaintiffs incorporate by reference their arguments in their Preliminary Injunction Motion, as to irreparable harm, balance of harms, and public interest.  *See* Order at 15-19.  This Court also found that remedies available at law, such as monetary damages, are  inadequate to compensate plaintiffs for their injury.  *Id.* at 17.  Plaintiffs will focus in this Memorandum on two points of possible concern on the merits the Court noted in her Order.

## IV.   LEGAL STANDARD

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In the ordinary case, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial to defeat the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The typical summary judgment standard does not apply to alligators, however.  "The *Fouke* injunction has never been dissolved or modified, and once a permanent injunction has been entered without a fixed date of termination, it continues indefinitely."  *See* Order at 5 (citation omitted).  As this Court explained, modification or dissolution of a permanent injunction places "the burden [] on the party seeking dissolution to establish 'a significant change in facts or law.'"  *Id*. at 8 (citation omitted).  Neither Defendants nor Intervenors have satisfied this burden.

## V.   ARGUMENT

While the *Fouke* injunction prevents Section 653o's enforcement as to American alligators indefinitely, Plaintiffs present arguments below further demonstrating ESA Section 6(f)'s preemption over Section 653o as regards all three crocodilian species.

**Memorandum of Law in Support**
**of Motion for Summary Judgment**          6

**A.      ESA's Implementing Regulations Contain a Specific "Exemption" for Threatened CITES Appendix II-Listed Species, Including these Alligators and Crocodiles**

This Court has already set out the standard for preemption, and explained the preemptive effect of ESA § 6(f).[1]

> The preemptive effect of ESA § 6(f) is clear.  If trade in American alligators, saltwater crocodile and Nile crocodiles is authorized by a permit or exemption under the [ESA] implementing regulations, the statute's prohibition in California Penal Code section 653o is preempted . . . the cases addressing § 1535 focus on the preemptive effect of a permit requirement, as opposed to an exemption.  The dispositive question here is whether the species at issue are covered by an exemption contemplated by § 1535(f).

Order at 11.

Based on the plain meaning of "exemption" and the statutory canon of construction *noscitur a sociis*, the Court then asked whether "a permit would be required absent some relief from that obligation," and observed that "the logical inference is that the obligation to which the exemption applies is an otherwise applicable permit requirement." *Id.* at 13.

The ESA's implementing regulations contain the specific "exemption" from the general permit requirement for threatened CITES Appendix II-listed species at 50 C.F.R. § 17.8(a).  Section 17.8(a) specifically explains:

> <u>Except as provided in a special rule</u> in §§ 17.40 through 17.48 or in paragraph (b) of this section, <u>all provisions of §§ 17.31 and 17.32 apply</u> to any specimen of a threatened species of wildlife that is listed in Appendix II of the Convention.

(Emphasis added).

Section 17.8 contains each of the elements for an exemption identified by the Court.  The general permit requirement for threatened species, including threatened by similarity of appearance species, is set forth at 50 C.F.R. § 17.32.  Complying with Section 17.32's permit requirements "for

---

[1] In relevant part, Section 6(f) provides:

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent it may effectively … (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter.

16 U.S.C. § 1535(f).

any activity otherwise prohibited with regard to threatened wildlife" represents the "obligation to which the exemption applies." *See* Order at 13. Indeed, Section 17.8(a) prescribes that "all provisions of…[§] 17.32 apply to any specimen" of an Appendix-II listed species "[e]xcept as provided in a special rule in §§ 17.40 through 17.48 or in paragraph (b)." The alligator and crocodile special rules are found in Sections 17.42(a) and 17.42(c), respectively. Finally, Section 17.8 is contained within the series of specifically-titled "exemptions" set forth at 50 C.F.R. §§ 17.4 through 17.8.

Moreover, trade in the alligators and crocodiles in this case also is subject to a second, broader exemption applicable to all wildlife managed under ESA special rules. The general permit requirement set forth in Section 17.32 confirms: "Such permit shall be governed by the provisions of this section, unless a special rule applicable to wildlife, appearing in §§ 17.40 through 17.48 of this part provides otherwise." 50 C.F.R. § 17.32. As the Court has already explained, ESA Section 6(f) uses the disjunctive "or" between the terms "permit" and "exemption." Order at 13. Thus, the following conclusion by the Court applicable to Nile and saltwater crocodiles applies equally to American alligators: "Because one who adheres to CITES is exempted from a permit requirement by the special rules on reptiles, this provision appears to be the exemption contemplated under the preemption clause." *Id.* at 14. As explained above, the special rules are and implement an "exemption contemplated under the preemption clause" for both alligators and crocodiles.

Further, the threatened species prohibited activities provision set forth at 50 C.F.R. § 17.31 also confirms the either/or choice between a Section 17.32 permit and the exemption for wildlife managed under special rules. Section 17.31(a) states that, "Except as provided in §§ 17.4 through 17.8, or in a permit issued under this subpart, all of the provisions of § 17.21, except § 17.21(c)(5), shall apply to threatened species…unless the Secretary has promulgated species-specific provisions (see paragraph (c) of this section)." Section 17.8's role is explained above.

For its part, Section 17.31(c) overrides the general Section 17.32 permit condition made applicable in Section 17.31(a). Section 17.31(c) reads as follows:

> **Whenever a species-specific rule in §§ 17.40 through 17.48 applies** to a threatened species, **none of the [prohibitory] provisions of paragraphs (a) and (b) of this section will apply**. The species specific rule will contain all the applicable prohibitions and **exceptions**.

50 C.F.R. § 17.31(c) (emphasis added).  Under the ESA, the term "exceptions" includes both "exemptions" and "permits."  *See generally* 16 U.S.C. § 1539 (statutory section entitled "Exceptions" applicable to endangered species includes both "permits" (16 U.S.C. § 1539(a)) and "exemptions" (16 U.S.C. §§ 1539(b), (e) & (f))).

The CITES permits to trade in African elephant parts and products in *Man Hing* were likewise issued pursuant to an exemption provided for in 50 C.F.R. § 17.8; the elephant special rules are set forth in 50 C.F.R. § 17.40(e)(2), within the special rules for mammals.  The ESA regime authorizes CITES-sanctioned African elephant trade "without [such] a threatened species permit issued under § 17.32."  *See* 50 C.F.R. § 17.40(e)(2).  Similar "without" language can be found in the crocodile regulations. 50 C.F.R. § 17.42(c)(3).  Accordingly, the Court correctly concluded at the Preliminary Injunction stage that Section 17.42(c)(3) represents the ESA Section 6(f) exemption for threatened Nile and saltwater crocodiles authorized for trade by CITES.  *See* Order at 14.  The Court should affirm its prior finding here.

Likewise, because they are contained within 50 C.F.R. §§ 17.40-17.48, the activities authorized by the alligator regulations are exempt from the threatened species permit requirements contained in 50 C.F.R. § 17.32.   By prescribing how American alligators may be traded domestically, Section 17.42(a)(2)(ii) "provide[s] otherwise" than for the use of an ESA threatened species permit, under the terms of 50 C.F.R. § 17.32.

For international trade (that is, "import and export"), the special rule for American alligator also requires compliance with the international trade requirements of the CITES implementing regulations contained in 50 C.F.R. Part 23 (*see* 50 C.F.R. § 17.42(a)(3)), just as does the crocodile special rule.  Part 23 also contains the applicable permit requirements for export and re-export[2] of U.S. species traded pursuant to the CITES regime.  *See* 50 C.F.R. § 23.20(e) (referencing 50 C.F.R.

---

[2] The process is termed "re-export" when one exports an alligator abroad for, for instance, tanning and fabrication, and then seeks to bring the finished alligator product back (re-exports it) to the United States for re-sale.  50 C.F.R. § 23.5.

§ 23.36 (export permit) and 50 C.F.R. § 23.37 (re-export certificate)).  The alligator special rule provisions at 50 C.F.R. §§ 17.42(a)(2)(ii)(A) & 17.42(a)(3) thus represent the applicable preemptive ESA Section 6(f) exemption.  The Court was correct when it found, at the preliminary injunction stage, that "[t]he same logic that applies to Nile and saltwater crocodiles thus appears to apply here." Order at 14.  The Court should again affirm its ruling here.

### B.    Defendant-Intervenors' Arguments Regarding 16 U.S.C. § 1539 Are a Red Herring

The ESA, at 16 U.S.C. § 1533(d), rather than 16 U.S.C. § 1539, authorizes the Secretary to issue the special rules contained in 50 C.F.R. § 17.42.  The ESA contains two separate regimes for exemptions and permits: those applicable to endangered species authorized and set forth at 16 U.S.C. § 1539, and those applicable to threatened (and threatened by similarity of appearance) species authorized in 16 U.S.C. § 1533(d).  *See generally In Re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d 214, 219-20 (D.D.C. 2011) (discussing distinct regulatory tracks for endangered and threatened species).

Section 1539 does not apply to the alligators and crocodiles in this case.  Section 1539's "exceptions" to Section 1538's prohibitions apply by their terms only to endangered species.  Such an exception can be made via permit, *see* 16 U.S.C. §§ 1539(a), or exemption, *see* 16 U.S.C. §§ 1539(b), (e), (f).  Neither the Section 1538 prohibitions nor the Section 1539 exceptions apply to threatened species if the Secretary decides not to apply these endangered species laws to threatened species.[3]  The Secretary specifically elected not to apply the Section 1538 prohibition regime to these alligators and crocodiles.  Rather, his designees developed the special rules specified in 50 C.F.R. §§ 17.42(a) & (c), respectively.

Accordingly, the Court should not look to Section 1539 to find the source of authority for any "exemption or permit" in this case.  *But see* Order at 12.  Instead, ESA Section 1533(d) provides:

---

[3] The Court correctly explained that, until September 26, 2019, the Secretary applied the ESA Section 9 (16 U.S.C. § 1538) prohibitions to threatened species "by default."  Order at 13.  *See generally Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*, 1, F.3d 1, 5-6 (D.C. Cir. 1993), *modified on other grounds on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994), *rev'd on other grounds*, 515 U.S. 687 (1995); *see also In Re Polar Bear ESA Listing*, 818 F.Supp.2d at 229.  The Secretary eliminated the default rule for species listed after September 29, 2019.  84 Fed. Reg. 44753 (Aug. 27, 2019), but this change does not affect the case at bar.

> Whenever any species is listed as a **threatened** species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.   The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title….

16 U.S.C. § 1533(d) (emphasis added).[4]  If a species is threatened, Section 1533(d) grants the Secretary wide regulatory latitude.  *See* S.Rep. No. 93–307, at 8 (1973), 1973 U.S.C.C.A.N. 2989, 2997 ("Once an animal is on the threatened list, the Secretary has an almost infinite number of options available to him with regard to the permitted activities for those species….") (*quoted in In Re Polar Bear ESA Listing*, 818 F.Supp.2d at 230).

In contrast to the Section 1538 regime for endangered species, where the relevant permits and exemptions are established in statute, 16 U.S.C. § 1539, the Section 1533(d) regime for permits and exemptions for threatened species is established in the Code of Federal Regulations.  *See* 50 C.F.R. §§ 17.4-17.8, 17.31, 17.32, and 17.40-17.48.   This distinction between spelling the exemptions out via statute versus regulation is not relevant to Section 6(f).  Its preemptive terms apply to "an exemption or permit provided for in this chapter [*i.e.*, the ESA **or in any regulation which implements this chapter**." 16 U.S.C. § 1535(f) (emphasis added).  For the alligators and crocodiles in this case, their special rules thus represent the salient "exemption…provided for…in any regulation which implements this chapter."  These regulations (50 C.F.R. §§ 17.42(a) and 17.42(c)) furnish preemptive authority *vis-a-vis* Penal Code Sections 653o and 653r.

**C.     The Provision Requiring Adherence to "the Laws and Regulations of the State of Sale or Transfer" at 50 C.F.R. § 17.42(a)(2)(ii)(B) Holds the Same Meaning as the Similar Provision Found in *Man Hing*'s Elephant Permits**

The Court explained at the Preliminary Injunction stage that the American alligator special rule contains a "provision requiring sale or transfer of American alligator 'only in accordance with the laws and regulations of the State or Tribe…in which the sale or transfer occurs.'"  Order at 15 (quoting 50 C.F.R. § 17.42(a)(2)(ii)(B)).  At that time, though, the Court was "not convinced this case is directly analogous" to the elephant permits at issue in *Man Hing*.  *See id.*  Specifically, this

---

[4] As explained above, the Secretary's authority to impose Section 1538(a)(1) prohibitions for threatened species is permissive ("may"), not mandatory.  *See generally In Re Polar Bear ESA Listing*, 818 F.Supp.2d at 219-20.

Court was particularly concerned about the lack of express language regarding health and quarantine laws in the alligator regulations.  Order at 15.

Section 17.42(a)'s regulatory history demonstrates that a desire to expand the unique, **domestic** American alligator trade caused the limited state deference provision to be incorporated into the alligator special rules.  The development of the limited state deference provision, and the stepwise expansion of its scope, corresponded in time and cause with the incremental loosening of restrictions on the domestic alligator trade.  This loosening occurred in response to steady increases in alligator abundance and the maturation of the domestic and international crocodilian trading regime.

In *Man Hing*, the Appellee was a wholesale trader in African elephant ivory products.  Like Plaintiffs here, a special rule (50 C.F.R. § 17.40(e) authorized Appellee to engage in otherwise ESA-prohibited trade of threatened species.  Under that rule, Appellee was issued a federal permit containing a provision conditioning its validity upon "strict observance of all applicable foreign, state, and other federal law."  702 F.2d at 765.  The State-Appellants argued that this permit provision meant all state laws, including Section 653o, must be accorded full effect.  The Ninth Circuit rejected this argument, noting that the quoted condition was standard language used in all federal fish and wildlife permits.  *Id.* ("The condition is a part of the printed form used for all federal fish and wildlife permits issued for trade in endangered species.").  The Ninth Circuit Court instead held that this condition confirmed a permitholder's need to comply with 50 C.F.R. § 10.3, which requires that no permit shall "relieve a person from any other requirements imposed by a statute or regulation of any State…including any applicable health, quarantine, agricultural, or customs laws or regulations."  *Id.*

The requirements of 50 C.F.R. § 10.3 likewise apply to legally-traded alligator and crocodile species.  To import and export American alligators and ESA-exempted Nile and saltwater crocodiles, the same standard language at issue in *Man Hing* can be found on FWS-issued permits.  *See* N. Wall Decl., Exhibit 1 (where a permit issued for exporting American alligator hides states, at Condition B, that "[t]he validity of this permit is also conditioned upon strict observance of all

applicable foreign, state, local, tribal, or other federal law.").

There is only one segment of the overall crocodilian trade where permits containing this standard provision are not required: **<u>domestic</u>** trade in American alligators.  This absence of a domestic permit requirement for alligators is what led to regulatory confirmation of 50 C.F.R. § 10.3 in the federal regulations at 50 C.F.R. § 17.42(a)(2)(ii)(B).  Indeed, as the regulatory history demonstrates, it was the scaling back of alligator permit requirements, in response to population recovery, that required an expansion of the limited state deference provision to cover those trade segments no longer subject to permit requirements.

When the American alligator special rule at 50 C.F.R. § 17.42(a) was created in 1975, it only authorized the commercial taking of alligators in three Louisiana coastal parishes.  40 Fed. Reg. 44412 (Sept. 26, 1975).  Authorized takings were to be conducted "in accordance with the laws and regulations of the State of Louisiana."  In addition to tagging requirements, which remain in effect today, the rule also required buyers and tanners of "raw, green, salted, or otherwise untanned hides" to obtain Federal permits to trade in such hides.  *Id*. at 44428.  These buyers and tanners permits contained the provision – identical to those in *Man Hing* and which still exists in FWS import/export licenses – that conditioned the permit's validity "upon [the holder's] strict observance of all applicable foreign, state, local, tribal, or other federal law."  *Cf. Man Hing*, 702 F.2d at 765 (condition contained on "all" federal permits).[5]  Notably, the special rule at this time did not authorize trade in meat or other parts.  *Id*.

Over the next twelve years, the American alligator special rule was amended numerous times.  Many of these amendments were to reclassify the status of alligators in certain states and Louisiana parishes as research revealed that populations were reestablishing throughout the alligator's native range.  *See*, *e.g.*, 42 Fed. Reg. 2071 (Jan. 10, 1977) (reclassifying the American alligator from "endangered" to "threatened" in all of Florida and certain coastal areas of Georgia, Louisiana, South Carolina, and Texas); 44 Fed. Reg. 37130 (June 25, 1979) (expanding "threatened

---

[5] Consequently, in *Fouke Co. v. Brown*, this Court references that Plaintiff Fouke Company possessed a federal license, pursuant to the alligator special rule, which authorized it to buy, tan, and fabricate American alligator hides. 463 F.Supp. 1142, 1143 (E.D. Cal. 1979).

**Memorandum of Law in Support**
**of Motion for Summary Judgment**                13

due to similarity of appearance" classification from three to twelve Louisiana parishes); 46 Fed. Reg. 40664 (Aug. 10, 1981) (expanding "threatened due to similarity of appearance" classification to all of Louisiana).

Other amendments over that span of time adjusted the federal management of trade in alligator hides, meat, and other parts and products.  For instance, in 1979, FWS authorized the sale of meat and other parts from all lawfully taken alligators, including those that were farm-raised.[6] 44 Fed Reg. 59080 (Oct. 12, 1979).  However, such meat sales could be transacted "only in the State where the taking occurs." *Id.* at 59085.  It was at this time that the special rule for alligators adopted the state deference language at issue here.  *Id.* ("The meat and other parts, except hides, are sold only in the State in which the taking occurs, *and only in accordance with the laws and regulations of that State*.") (emphasis added).  The sale of alligator meat as food directly implicates "health, quarantine, customs, and agricultural laws." *See Man Hing*, 702 F.2d at 765.  The following year, FWS revised the special rule to, in part, authorize the interstate sale of alligator meat and other parts, and expanded the state deference provision accordingly, to the states of both taking and sale.  45 Fed. Reg. 78153, 78154 (Nov. 25, 1980).

Over the course of all these amendments, at least two things stayed the same: (i) buyers and tanners were required to possess a permit to trade in alligator hides, and (ii) hides were treated separately from meat and other parts.  However, in 1987, FWS pronounced that the American alligator population had fully recovered across its entire range, and thereby issued a final rule amending the special rule to remove domestic permitting requirements for buyers and tanners.  *See* 52 Fed. Reg. 21059 (June 4, 1987).  In doing so, hides were thereupon included in the provision requiring adherence to "the laws and regulations of…the State in which the sale or transfer occurs," to reiterate the 50 C.F.R. § 10.3 requirement that had previously existed in domestic permits.[7]

---

[6] At this time, only the State of Louisiana was federally authorized to take alligators in the wild; however, other states, such as Florida, authorized highly-regulated farming practices.  Prior to this final rule, farmers in those states were not allowed to process and sell the meat, leading to "the wasting of a valuable resource."  44 Fed. Reg. at 59081.

[7] The recent proposed rule from FWS acknowledges as much.  In addressing the State of Louisiana's petition to revert the special rule to the regime set out in the 1980 final rule, FWS recognized that while "earlier versions of the [special] rule did not, in the phrase in question, include hides in the group of parts and products that could only be sold in accordance with the laws of the State or Tribe in which the sale or transfer occurred…those earlier versions also strictly regulated the sale and transfer of hides, including by requiring that hides could only be sold or transferred to a person

In making this 1987 change, FWS did not announce that the intent was to suddenly broaden the scope of states' regulatory authority over commerce in hides, leather, and manufactured products.[8]  Indeed, the proposed rule never even proposed that an amendment to the limited state deference provision was being considered.  51 Fed. Reg. 19760 (June 2, 1986).  Under the presumption of regularity, FWS would not make such a thorough-going change to the alligator trading regime without proposing to make that change in the rule.  *See generally Government of Guam v. Guerrero*, 11 F.4th 1052, 1058 (9th Cir. 2021) ("[A] public actor is entitled to the presumption of regularity where there is some evidence that the public actor properly discharged the relevant official duties.").   Rather, the inclusion of hides in the state deference provision was done to confirm application of 50 C.F.R. § 10.3 to federally-authorized trade in such products that could occur without a permit, which became necessary following the rescission of buyers and tanners permits in 1987.

Finally, in FWS's most recent permanent change to the alligator special rule, which resulted in a definition change that categorized all "hides, meat, and other parts" under the umbrella term "specimen" (which was a result of bringing all applicable ESA regulations into line with changes made during CITES Conferences of the Parties), FWS cited to the Ninth Circuit's precedent in *Man Hing* and *H.J. Justin* to confirm that "in instances where a CITES species is also listed as endangered or threatened under the ESA, any State or local law that would effectively prohibit the import or export of, or interstate or foreign commerce in, specimens of such species is void to the extent that such trade is authorized under the ESA, its implementing regulations, or any ESA permit or exemption." 72 Fed. Reg. 48402, 48406 (Aug. 23, 2007).[9]  Such plain language in 2007 only serves

---

holding a valid buyer permit…."  86 Fed. Reg. 5112, 5116 (Jan. 19, 2021).  Likewise, the in-state and then interstate sale of alligator meat and other parts, for which the limited state deference provision was created in 1979 and then expanded in 1980, respectively (*see infra*, at p. 16), was and is also conducted without permits.

[8] This is especially given that the *Fouke* ruling, issued in 1979, had already established the precedent that state laws like Section 653o were preempted from enacting comprehensive trade bans in alligator hides.

[9] FWS's acknowledgement of *Man Hing* also supports the Ninth Circuit's reasoning that upholding "application of section 653o in the face of federal permits allowing trade…would pave the way for a day when an enterprise…could secure a federal permit authorizing trade…yet find itself unable to conduct such trade within the United States because of widespread adoption of statutes paralleling California's section 653o." 702 F.2d at 765, n.5.  Although Section 6(f) preempts Section 653o(b) in its entirety via explicit preemption, the Ninth Circuit's holding in *Man Hing* also supports implied preemption – that is, that Section 653o(b) may not prohibit the intrastate sale of alligators, crocodiles, and their

to further reiterate the agency's longstanding position on Section 6(f)'s preemptive relationship from 1973.  *See* Letter from Douglas P. Wheeler to John D. Dingell (June 13, 1973), Hearings on Endangered Species before the Subcomm. On Fisheries and Wildlife Conservation and the Environment of the H. Comm. On Merchant Marine Fisheries, 93rd Cong. (1st Sess. 387)[10] (where the Department of the Interior, as drafters of the ESA provision in question, stated its intent that states be preempted "in an area of traditional Federal concern (commerce), especially where treaty obligations are relevant to the issuance of permits or exemptions."); *see also* Plaintiffs' Reply to Intervenors (ECF 46) at 7-9.

In both concept and practice, nothing has changed with regard to the preemptive effects of the alligator special rule over state laws like Section 653o since the rule's implementation in 1975. Despite changes to the special rule over time, the intent that states like California should not be allowed to unilaterally prohibit commerce in federally-exempted endangered and threatened species remains true.  To hold otherwise would grant individual states the authority to infringe upon the United States' international commitments via CITES.  Based on the structure of the special rule from 1975 to 1987, as well as FWS's consistent commentary regarding the intent of the ESA's preemption provision, it is inconceivable that FWS intended to provide states like California with such unilateral authority in this one instance regarding domestic trade in American alligators.

### D.   This Court Should Refrain From Deciding Any Motion For Summary Judgment Until a Final Decision is Reached on FWS's Proposed Rule

Although this Court denied Plaintiffs' *ex parte* request for extension of the briefing schedule, the Court left open the opportunity for Parties to comment on the impact of a future final rule change to the American alligator special rule at 50 C.F.R. § 17.42(a)(2)(ii)(B).  *See* ECF 64; *see also* 86 Fed. Reg. 5112 (Jan. 19, 2021).  Based on information and belief, FWS is currently reviewing and evaluating the 173 comments received during the public notice-and-comment period for the

---

parts and products if such foreign and interstate commerce is authorized under the ESA.  *See, e.g., City of Charleston v. A Fisherman's Best*, 310 F.3d 155, 169 (4th Cir. 2002) ("Implied preemption occurs where Congress, through the structure or objectives of federal law, has impliedly precluded state regulation in the area.").  The *Delacroix* plaintiffs' brief in the consolidated case addresses implied preemption in more detail, and Plaintiffs adopt these arguments as if set forth in full herein.

[10] A copy of this letter was submitted to the record in Plaintiffs' Reply to Intervenors as "Attachment A" (ECF 46-1).

**Memorandum of Law in Support**
**of Motion for Summary Judgment**          16

proposed rule.  While this information may not be clearly indicative of a forthcoming final rule, it certainly demonstrates the likelihood that such proposed rule has survived the 60-day Administrative "regulatory freeze" implemented following the inauguration of President Biden.  *See* January 20, 2021 Memorandum for the Heads of Executive Departments and Agencies.  Further, of the 173 comments received during the public comment period, the vast majority (over 165) of these comments were submitted in support of the rule.  The Court's continued patience with the regulatory process could thus yield additional clarity – if any is needed following summary judgment briefing – regarding the scope of the alligator rule's limited state deference provision.  Plaintiffs would thus request this Court withhold any final decision on Parties' motions for summary judgment until such time that FWS completes the regulatory process pertaining to the alligator proposed rule at 86 Fed. Reg. 5112.

## VI.    CONCLUSION

For all the reasons discussed herein, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment regarding Count I of their Complaint.

Respectfully submitted,

Dated: October 29, 2021

By: _____ /s/ *Christopher D. Hughes* _____
NOSSAMAN LLP
Paul S. Weiland (SBN 237058)
Benjamin Z. Rubin (SBN 249630)
Christopher D. Hughes (SBN 254864)
621 Capitol Mall, Suite 2500
Sacramento, CA 95814
Telephone: (916) 442-8888
Facsimile: (916) 442-0382
pweiland@nossaman.com
brubin@nossaman.com
chughes@nossaman.com

By: _____ /s/ *David E. Frulla* _____
KELLEY DRYE & WARREN LLP
David E. Frulla (*pro hac vice*)
Bret A. Sparks (*pro hac vice*)
Bezalel A. Stern (*pro hac vice*)
3050 K Street NW, Suite 400
Washington, DC 20007

Telephone:  (202) 342-8400
Facsimile:  (202) 342-8451
dfrulla@kelleydrye.com
bsparks@kelleydrye.com
bstern@kelleydrye.com

*Counsel for Plaintiffs*