1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    April in Paris, et al.,                        No. 2:19-cv-02471-KJM-CKD

12                        Plaintiffs,

13          v.

14    Rob Bonta, et al.,

15                        Defendants.

16

17    Louisiana Wildlife and Fisheries               No. 2:19-cv-02488-KJM-CKD
      Commission, et al.,
18                                                    ORDER

19                        Plaintiffs,

20          v.

21    Rob Bonta, et al.,

22                        Defendants.

23

24          The parties in these consolidated cases each move for summary judgment on a narrow

25    legal question: does the federal Endangered Species Act preempt California criminal laws that

26    punish imports and sales of alligator and crocodile products?  When Congress passed the

27    Endangered Species Act, it intended to preempt state laws prohibiting what federal regulations

28    authorize.  California law prohibits what the U.S. Department of Fish & Wildlife has authorized

                                            1

under the Endangered Species Act, so the state's laws are preempted, as explained further in this order.  The court **grants** plaintiffs' cross-motions for summary judgment in both cases, and **denies** the defendants' motions.

## I.      BACKGROUND

The Endangered Species Act creates a federal program for the conservation of fish, wildlife and plants.  16 U.S.C. § 1531(b).  It gives detailed instructions to the Secretaries of the Interior and Commerce to create lists of "endangered" and "threatened" species.  *See id.* § 1533.  These agencies have delegated that authority to the U.S. Fish and Wildlife and National Marine Fisheries Services.  50 C.F.R. § 402.01(b).  In broad strokes, a species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A "threatened" species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).  In some cases, the government also can treat a species as endangered or threatened even though it is not in danger of extinction and not likely to become an endangered species.  *See id.* § 1533(e).  If a non-listed species "so closely resembles" a listed species that enforcement officers "would have substantial difficulty in attempting to differentiate between the listed and unlisted species," and if a number of other ancillary requirements are satisfied, then the government can afford the non-listed species the same protections as the listed species.  *See id.*

Endangered and threatened species receive different protections.  If a species is endangered, the Endangered Species Act generally prohibits all imports, exports, sales, deliveries and "taking" of the species.  *See id.* § 1538(a)(1); *see also* 50 C.F.R. § 17.21.  The verb "take" is a defined term.  It means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  By contrast, if a species is threatened, the Endangered Species Act offers the administration more flexibility.  *See id.* § 1533(d).  In practice, however, the administration applies most of same protections to threatened species as it does to endangered species.  *See* 50 C.F.R. § 17.31.

/////

The Endangered Species Act and the regulations implementing that Act create several exceptions and exemptions. A few are simple and practical, such as those permitting "any person" to take wildlife "in defense of his own life or the lives of others," *id.* § 17.21(c)(2), and allowing officers to take wildlife if necessary to "[a]id a sick, injured or orphaned specimen," *id.* § 17.21(c)(3)(i). Other exceptions are broader and more complex. For example, the government can permit a taking if the taking is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). The Endangered Species Act creates a regulatory process for permits in this latter category. *See id.* § 1539(a)(2). The applicant must submit a conservation plan, the public can submit comments, and the government must be satisfied that several statutory requirements are satisfied. *See id.*

The U.S. Fish and Wildlife Service also has issued a number of "special rules" that permit takings and trade in some circumstances. Among these are the special rules for reptiles. *See* 50 C.F.R. § 17.42. Two of these special rules are the subject of this case.

The first special rule allows some takings of American alligators (*Alligator mississippiensis*). American alligators are neither threatened nor endangered, but they are treated as threatened because American alligator products can be difficult to distinguish from those of threatened crocodilians. *See id.* § 17.11(h). Under the special rule, "[n]o person may take any American alligator" with two exceptions, one narrow and one broad. The narrow exception allows certain federal and state employees or agents to take an American alligator "when acting in the course of official duties." *Id.* § 17.42(a)(2)(i). The broad exception allows anyone to take an American alligator, but imposes detailed conditions:

> (ii) Any person may take an American alligator in the wild, or one which was born in captivity or lawfully placed in captivity, and may deliver, receive, carry, transport, ship, sell, offer to sell, purchase, or offer to purchase such alligator in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity in accordance with the laws and regulations of the State of taking subject to the following conditions:

> (A) Any skin of an American alligator may be sold or otherwise transferred only if the State or Tribe of taking requires skins to be tagged by State or tribal officials or under State or tribal

3

supervision with a Service-approved tag in accordance with the
requirements in part 23 of this subchapter; and

(B) Any American alligator specimen may be sold or otherwise
transferred only in accordance with the laws and regulations of
the State or Tribe in which the taking occurs and the State or
Tribe in which the sale or transfer occurs.

*Id.* § 17.42(a)(2)(ii).  The special rule also allows imports and exports: "Any person may import

or export an American alligator specimen provided that it is in accordance with part 23 of this

subchapter."  *Id.* § 17.42.(a)(3).

Part 23, cross referenced above, includes regulations to fulfill the United States'

obligations under the Convention on International Trade in Endangered Species of Wild Fauna

and Flora, commonly abbreviated "CITES."  *See, e.g.*, 50 C.F.R. §§ 23.1(a), 23.20(e).  CITES

governs international trade in products of many animal species.  *See id.* § 23.70.  For purposes of

this case, the most salient of the CITES regulations are shipping and labeling requirements.  For

example, all skins and parts must be tagged and labelled with a self-locking tag and unique serial

number.  *See id.* § 23.70(d)–(f).

The second special rule at issue in this case applies to several other crocodilians, including

Nile and Saltwater crocodiles (*Crocodylus nilocticus* and *Crocodylus porosus*, respectively).  *Id.*

§ 17.42(c)(1)(i)(E), (F).  The Nile crocodile is currently listed as threatened, and some

populations of Saltwater crocodiles are listed as threatened or endangered.  *See id.* § 17.11(h); *see

also* U.S. Fish & Wildlife Serv., "Reclassification of Saltwater Crocodile Population in Australia

from Endangered to Threatened," 61 Fed. Reg. 32356 (June 24, 1996).  Under the special rules

for these crocodilians, "live specimens" are subject to the full set of prohibitions and permitting

rules in sections 17.31 and 17.32.  50 C.F.R. § 17.42(c)(2)(i).  Skins and other products may be

imported, exported, sold, and delivered with a permit.  *See id.* § 17.42(c)(2).  In some

circumstances, however, the administration does not require a permit:

Except as provided in (c)(2)(i), you may import, export, or re-export,
or sell or offer for sale, deliver, receive, carry, transport, or ship in
interstate or foreign commerce and in the course of a commercial
activity, threatened crocodilian skins, parts, and products without a
threatened species permit otherwise required under § 17.32 provided

4

the requirements of parts 13, 14, and 23 of this subchapter and the
requirements of paragraphs (c)(3) and (4) of this section have been
met.

*Id.* § 17.42(c)(3).  The many cross-references in this paragraph point to regulations governing live

specimens, *see id.* § 17.42(c)(2)(i); regulations for "the issuance, denial, suspension, revocation,

and general administration of all permits," *see id.* § 13.2; import and export regulations, *see id.*

§ 14.1, regulations implementing the United States' CITES obligations, *see id.* § 23.1(a), specific

tagging and labeling rules, *see id.* § 17.42(c)(3); and "additional restrictions in trade of threatened

crocodilians," *see id.* § 17.42(c)(4).

The Endangered Species Act also includes a detailed section about the relationship

between the federal government and the states.  *See* 16 U.S.C. § 1535.  That section begins by

directing federal agencies to "cooperate to the maximum extent practical with the States."  *Id.*

§ 1535(a).  For example, the federal government must consult with a state "before acquiring any

land or water . . . for the purpose of conserving any endangered species or threatened species."

*Id.*  The federal government may also enter "cooperative agreements" with "any State which

establishes and maintains an adequate and active program for the conservation of endangered

species and threatened species," *id.* § 1535(c)(1), and the government may "provide financial

assistance" to the cooperating state, *id.* § 1535(d)(1).  These provisions and others have led other

courts to describe the Endangered Species Act and its implementing regulations as "cooperative

federalism."  *Gibbs v. Babbitt*, 214 F.3d 483, 503 (4th Cir. 2000).  But if state laws and

regulations conflict with the Endangered Species Act and its implementing regulations, the state

rules are expressly preempted by section 6(f), codified at 16 U.S.C. § 1535(f).

Section 6(f) has two basic parts.  The first delineates the preemption affirmatively:

Any State law or regulation which applies with respect to the
importation or exportation of, or interstate or foreign commerce in,
endangered species or threatened species is void to the extent that it
may effectively (1) permit what is prohibited by this chapter or by
any regulation which implements this chapter, or (2) prohibit what is

/////

5

authorized pursuant to an exemption or permit provided for in this
chapter or in any regulation which implements this chapter.

16 U.S.C. § 1535(f).  "This chapter" refers to Chapter 35 of Title 16, the Endangered Species Act.

Section 6(f) thus prohibits two types of conflicts between federal and state laws and regulations.

If a state law or regulation permits conduct that is forbidden by the Endangered Species Act or its

implementing regulations, then the state law is preempted.  Likewise, if the Endangered Species

Act or its implementing regulations authorize conduct by "exemption or permit," then a state may

not prohibit the authorized conduct.

The second part of section 6(f) clarifies which state laws and regulations are not

preempted.  It begins by clarifying that aside from the preemption in the first sentence, the

Endangered Species Act should not be read as preempting certain state conservation efforts: "This

chapter shall not otherwise be construed to void any State law or regulation which is intended to

conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such

fish or wildlife."  *Id.*  Section 6(f) ends by making clear that state laws or regulations "respecting

the taking of an endangered species or threatened species may be more restrictive than the

exemptions or permits provided for in this chapter or in any regulation which implements this

chapter but not less restrictive than the prohibitions so defined."  *Id.*

Litigation over section 6(f) reached California federal courts only a few years after the

Endangered Species Act was passed.  In an action filed in this court in the late 1970s, another

judge of this court permanently enjoined California from enforcing sections 653o and 653r of the

state penal code against trade in American alligator products, citing section 6(f).  *See generally*

*Fouke Co. v. Brown*, 463 F. Supp. 1142 (E.D. Cal. 1979).  Similar challenges wound their way

through California federal courts a few years later.  The Ninth Circuit affirmed a district court's

determination that the Endangered Species Act preempted California laws that criminalized trade

in elephant ivory products, but held in a companion case that the same California laws were not

preempted with respect to Indonesian pythons and Wallaby kangaroos.  *See generally Man Hing*

*Ivory & Imports, Inc. v. Deukmejian*, 702 F.2d 760, 761 (9th Cir. 1983); *H.J. Justin & Sons, Inc.*

*v. Deukmejian*, 702 F.2d 758 (9th Cir. 1983) (per curiam).

Despite *Fouke*, *Man Hing* and *H.J. Justin*, the California legislature did not amend the two relevant penal code sections, 653o and 653r.  In 2006, the Governor of Louisiana sponsored a bill to remove the American alligator from California Penal Code section 653o.  *See* Cal. Senate Comm. on Nat. Res. & Water, S.B. 1485 Bill Analysis at 1 (May 9, 2006); *see also* Cal. Assembly Comm. on Water Parks & Wildlife, S.B. 1485 Bill Analysis (May 15, 2006).  The Governor and the bill's author argued that successful conservation efforts had pulled the American alligator back from the brink of extinction.  Sen. Comm. Analysis at 1–2.  In the intervening years, the American alligator had been removed from the "endangered" and "threatened" lists, and other states had repealed their prohibitions on alligator products.  *See id.* at 2.  Opponents of this proposed legislation argued that alligator hides were difficult to distinguish from the hides of other crocodilians, and pointed out the Ninth Circuit had upheld some of section 653o in its 1983 decisions.  *See id.*

The state removed the American alligator from section 653o as proposed, but it added a sunset clause: starting January 1, 2010, crocodiles and alligators would again be a part of the restrictions in section 653o.  *See* 2016 Cal. Stat. Ch. 660 (S.B. 1485).  The legislature extended the 2010 effective date twice more, in 2009 and 2014.  2009 Cal. Stats. Ch. 15 (S.B. 609); 2014 Cal. Stats. Ch. 464 (S.B. 2075).  In 2019, legislation was proposed to again extend the effective date, but these bills did not pass.  *See, e.g.*, Assembly Bill 719, 2019–2020 Reg. Sess. (Cal. 2019).  As a result, beginning on January 1, 2020, the following prohibition came into force:  "[I]t is unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or a part or product thereof, of a crocodile or alligator."  Cal. Pen. Code § 653o(b)(1).  Violators are "guilty of a misdemeanor and shall be subject to a fine of not less than one thousand dollars ($1,000) and not to exceed five thousand dollars ($5,000) or imprisonment in the county jail not to exceed six months, or both that fine and imprisonment, for each violation."  *Id.* § 653o(d).  Section 653r imposes a similar prohibition.[1]

---

[1] "Notwithstanding the provisions of Section 3 of Chapter 1557 of the Statutes of 1970, it shall be unlawful to possess with intent to sell, or to sell, within this state, after June 1, 1972, the dead body, or any part or product thereof, of any fish, bird, amphibian, reptile, or mammal

1  A few weeks before the prohibition in section 653o(b)(1) came into force, several

2 businesses that distribute and sell products made from alligator and crocodile parts challenged

3 that provision in this court.  *See generally* Compl., ECF No. 1; First Am. Compl., ECF No. 8.[2]  In

4 a separate action, three Louisiana organizations, including the Louisiana Wildlife and Fisheries

5 Commission, filed a similar challenge.  *See generally* Compl., No. 19-cv-2488, ECF No. 1.  The

6 parties stipulated to the entry of a temporary restraining order until the court could hear and

7 resolve the plaintiffs' motions for a preliminary injunction in both cases.  *See* Stip., ECF No. 29.

8 The United States filed an *amicus curiae* brief with the court's permission, ECF No. 34-1, and the

9 court permitted three nonparty organizations to intervene in defense of section 653o, *see*

10 Intervention Order, ECF No. 43.

11  The court consolidated the two cases and granted the plaintiffs' motions for a preliminary

12 injunction.  *See generally* Prelim. Inj. Order, ECF No. 48.  The preliminary injunction bars the

13 California Attorney General and the Director of the California Department of Fish and Wildlife

14 from enforcing Penal Code sections 653o and 653r "in connection with the importation,

15 possession, or sale of American alligator bodies, parts, or products thereof, and the bodies, parts,

16 or products" of certain Saltwater and Nile crocodiles listed in CITES "until the final disposition

17 of this case."  *Id.* at 20.  The court then set a schedule to resolve the case on cross-motions for

18 summary judgment.  *See* Mins., ECF No. 52.

19  Before the parties' briefs came due, the U.S. Fish & Wildlife Service proposed amending

20 the special rule for American alligators.  As noted above, that special rule allows sales and

21 transfers "only in accordance with the laws and regulations of . . . the State or Tribe in which the

22 sale or transfer occurs."  50 C.F.R. § 17.42(a)(2)(ii)(B).  Louisiana urged the Fish & Wildlife

23 Service to drop that requirement, which it contended was confusing and unnecessary.  *See* U.S.

24 Fish & Wildlife Serv., Proposed Rule, 86 Fed. Reg. 5111, 5116 (Jan. 19, 2021).  The

---

specified in Section 653o or 653p.  Violation of this section constitutes a misdemeanor."  Cal.
Pen. Code § 653r (line break omitted).

  [2] Unless otherwise noted, all record citations refer to the docket in the lead case, No. 19-2471.

administration "evaluated" that petition and "concluded that there is sufficient reason for a new rulemaking" as Louisiana had proposed. *Id.* In light of this notice, the court extended the briefing schedule for the parties' cross-motions. *See* Orders, ECF Nos. 59, 64. After many months, however, the proposed change remained a proposal only, so the court denied a request to again extend the briefing schedule, and the case moved forward. *See* Order, ECF No. 64. The Fish & Wildlife Service still has not adopted the proposed rule change.

The parties have now briefed cross-motions for summary judgment on a single, narrow, dispositive issue: does the Endangered Species Act preempt the portions of California Penal Code sections 653o and 653r that relate to alligator and crocodile parts and products? The plaintiffs in both cases argue the answer is "yes," as a matter of both express and implied preemption. *See generally* Pl.'s Mem., ECF No. 65-1; Delacroix Mem., No. 19-2488, ECF No. 54-1; Opp'n to Cal., ECF No. 69; Opp'n to Intervenors, ECF No. 68; Delacroix Reply, No. 19-2488, ECF No. 58. California argues the answer is "no" because in its view, section 653o applies only to activities entirely within the state, not to interstate or foreign commerce. *See generally* Cal. Mem., ECF No. 66-1; Cal. Reply, ECF No. 70. The intervenors argue the California law is not preempted, but for a different reason. They contend the Endangered Species Act does not void state laws that offer greater protections than federal law. *See generally* Intervenors' Mem., ECF No. 67-1; Intervenors' Reply, ECF No. 71.

The court heard oral arguments in a combined hearing on March 4, 2022. Christopher Hughes, David Frulla, and Bret Sparks appeared for the plaintiffs in Case No. 19-2471. Joseph St. John appeared for the plaintiffs in Case No. 18-2488. Gwynne Hunter appeared for the Attorney General in both cases. Christopher Meyer, Sidni Frederick and Deborah Sivas appeared for the intervenors in both cases.

## II.   LEGAL STANDARD

A court may grant summary judgment to any party who "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cross motions for summary judgment are evaluated separately under the same standard. *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir.

2003).  When the parties do not dispute the material facts, as in this case, the court need only

determine whether any party is entitled to judgment on the disputed claims.

### III.   DISCUSSION

####    A.    The Permanent Injunction in *Fouke v. Brown*

Initially, the court must determine whether the plaintiffs are entitled to summary judgment

under the permanent injunction issued many years ago in *Fouke v. Brown*.  In that case, two

sellers of alligator hides and alligator hide products challenged California's ban on alligator

product sales, citing section 6(f).  *See* 463 F. Supp. at 1143–44.  At the time, the U.S. Fish &

Wildlife Service's special rule for American alligators was more restrictive than it is today.  With

the exception of only three Louisiana parishes, American alligators in the wild were listed as

"endangered" or "threatened."  *See* U.S. Fish & Wildlife Serv., Endangered and Threatened

Wildlife, 42 Fed. Reg. 2071, 2076 (Jan. 10, 1977).  The special rules for reptiles permitted takings

in only those three parishes, and they required buyers to obtain a federal permit.  *See id.*

(reproducing 50 C.F.R. § 17.42(a)(1)(i)(E) (1977)).

In *Fouke*, the buyer had obtained the necessary federal permit, so there was no dispute that

federal regulations and the Endangered Species Act would not bar its plan to sell alligator

products in California.  *See* 463 F. Supp. at 1144.  The district court thus concluded that

California's law was preempted: it prohibited conduct that was authorized by federal regulations

and a federal permit.  *See id.*  The court permanently enjoined the Governor and Attorney General

from enforcing the California Penal Code sections in question as applied to American alligator

hides "unless the same are taken, bought, tanned, or fabricated in contravention of the U.S.

Endangered Species Act," its implementing regulations, or the terms of a permit or exemption

issued under those regulations.  *See id.* at 1145.

The *Fouke* injunction remains in place today.  It applies squarely to the plaintiffs' claims.

The same preemptive statute and the same state laws were at issue then as now.  One of the

defendants in this case is the California Attorney General, who was among the defendants who

was enjoined in *Fouke* from enforcing Penal Code sections 653o and 653r in relation to American

alligator hides, which are some of the same products now in dispute.

1    Despite these similarities, California and the intervenors each argue the injunction does

2  not apply to this case.  California argues the modern version of section 653o does not regulate

3  interstate commerce, but rather only activity within the state.  *See* Cal. Mem. at 9.  This argument

4  rests on the first phrase of the express preemption provision in section 6(f), which voids state laws

5  and regulations only if they apply "with respect to the importation or exportation of, or interstate

6  or foreign commerce in, endangered species or threatened species."  16 U.S.C. § 1535(f).  This

7  court rejected the state's argument in its previous order.  *See* Prelim. Inj. Order at 9.  The court

8  reaches the same conclusion now for three reasons.

9    First, both the previous and modern versions of section 653o unambiguously regulate

10  interstate commerce by expressly forbidding imports.  Both versions make it unlawful to "import

11  into this state" alligator products "for commercial purposes."  Both versions also apply to all who

12  "possess" alligator products "with intent to sell," no matter whether the intended sale is inside or

13  outside California.

14    Second, the express preemption in section 6(f) is broader than California suggests.

15  Section 6(f) refers to two types of state laws and regulations: those that "appl[y] with respect to

16  the importation or exportation of" endangered and threatened species, and those that "appl[y]

17  with respect to . . . interstate or foreign commerce."  *Id.*  This court must avoid any interpretation

18  of this two-part phrase that renders it redundant.  *See United States v. Alaska*, 521 U.S. 1, 59

19  (1997).  The best way to avoid redundancy is to understand section 6(f) as encompassing two

20  types of state laws and regulations: those that apply specifically "with respect to" imports and

21  exports, and those that apply more generally "with respect to interstate and foreign commerce."

22  In other words, California cannot prevail simply by showing section 653o leaves imports and

23  exports untouched.  It also must show section 653o does not apply "with respect to" interstate or

24  foreign commerce at all.  Section 653o clearly "applies with respect to" interstate and foreign

25  commerce by prohibiting all sales of American alligator products within California's borders,

26  regardless of origin and destination.

27    Third, the modern version of section 653o and the version at issue in *Fouke* are nearly

28  identical.  When *Fouke* was decided in 1979, section 653o made it "unlawful to import into this

11

1    state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead

2    body or any part or product thereof, of any alligator."  463 F. Supp. at 1143 (quoting Cal. Pen.

3    Code § 653o (1971)).  Today, section 653o makes it "unlawful to import into this state for

4    commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or a

5    part or product thereof, of [an] alligator."  Cal. Pen. Code § 653o(b)(1).  California has identified

6    no meaningful difference between these versions of the statute.  The court can identify none.  The

7    two versions also have similar practical effects.  As were the plaintiffs in *Fouke*, the plaintiffs in

8    this case are foreign to California.  Both cases were challenges by organizations that feared

9    section 653o would bar sales of alligator skins and products originating outside California.  Both

10   versions of section 653o imposed restrictions on interstate commerce in practice.

11          California resists this conclusion by urging the court to interpret section 653o narrowly.

12   *See* Cal. Mot. at 9–10.  For ease of reference, here is the relevant language of section 653o once

13   more: "Commencing January 1, 2020, it is unlawful to import into this state for commercial

14   purposes, to possess with intent to sell, or to sell within the state, the dead body, or a part or

15   product thereof, of a crocodile or alligator."  Cal. Penal Code § 653o(b)(1).  The state argues the

16   trailing modifier "within the state" applies to each of the prohibited activities in the list it follows.

17   *See id.*  That is, California proposes reading section 653o as making it unlawful only to "import

18   into this state for commercial purposes *within the state*, to possess with intent to sell *within the*

19   *state*, or to sell *within the state*."  *See* Cal. Mot. at 10 (emphasis added).

20          That interpretation is a poor fit for the text of section 653o.  Although a trailing modifier

21   can limit each item in the preceding list, that is unlikely to be true if the list is not a cohesive

22   whole and is not separated from the trailing modifier by a comma.  *See Facebook, Inc. v. Duguid*,

23   141 S. Ct. 1163, 1170 (2021).  The better interpretative rule for section 653o is the rule of the last

24   antecedent: "a limited clause or phrase should ordinarily be read as modifying only the noun or

25   phrase that it immediately follows."  *Id.* (alteration omitted) (quoting *Barnhart v. Thomas*, 540

26   U.S. 20, 26 (2003)).  This interpretive rule fits the statutory and factual context better than

27   California's reading, which leads to the unlikely conclusion that the state has banned only

28   "imports into this state for commercial purposes *within* the state," and not "imports into this state

1    for commercial purposes *outside* the state." Nor does California claim any interest in protecting

2    alligator populations within its territory from a domestic threat.

3           The legislative history of the modern alligator prohibition confirms California lawmakers

4    had interstate and foreign commerce in mind. The legislators who sought to keep alligator and

5    crocodile products off the list in section 653o cited successful conservation efforts in other states

6    and the importance of global trade. *See* California Senate Committee on Natural Resources and

7    Water, Hearing on A.B. 719 at 3–4 (July 9, 2019). Legislators who sought to reactivate the ban

8    emphasized the danger of confusing illegal wildlife products from Latin America and elsewhere

9    with legal and licensed imports. *See id.* at 4–5. For these reasons as well, *Fouke v. Brown* cannot

10   be distinguished by interpreting the current version of section 653o narrowly.

11          The intervenors advance very different arguments to distinguish *Fouke*. They begin by

12   urging the court to find the injunction in *Fouke* "does not apply" because the federal "regulatory

13   scheme" has "significantly changed" since 1979. Intervenors' Mem. at 8. For example, permits

14   are no longer required for most transactions. *See id.* Even if this argument is correct, it would

15   not make a meaningful difference for this case. Although the *Fouke* injunction cites federal

16   regulations, it does so only to clarify that California may enforce its Penal Code against those

17   who do not abide by federal laws and regulations. *See* 463 F. Supp. at 1145. There is no

18   evidence to show the plaintiffs in these consolidated cases have not complied with applicable

19   federal regulations. The permanent injunction in *Fouke v. Brown* is thus applicable to the

20   plaintiffs' claims about American alligator products.

21          In addition to arguing the permanent injunction does not apply, the intervenors argue the

22   court should dissolve or modify the injunction if it does apply. *See* Intervenors' Mem. at 8–10.

23   "The power of a court of equity to modify a decree of injunctive relief is long-established, broad,

24   and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (quoting *N.Y. State Ass'n for Retarded*

25   *Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)). When a party asks to modify or

26   dissolve an injunction, the court considers whether "a significant change in facts or law warrants

27   revision or dissolution of the injunction." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir.

28   2019) (per curiam) (quoting *Sharp v. Weston*, 233 F.3d 116, 1170 (2000)). The relevant test has

1   two parts: the moving party must show not only that the facts or the law have changed

2   significantly, but also that in light of that change, the injunction should be dissolved or modified

3   under the same legal standard that governed the previously entered injunction. *See id.* at 1198 &

4   n.14 (applying standard for preliminary injunctions to request to dissolve a preliminary

5   injunction).

6        This legal test "presumes that the moving party could have appealed the grant of the

7   injunction but chose not to do so, and thus that a subsequent challenge to the injunctive relief

8   must rest on grounds that could not have been raised before." *Alto v. Black*, 738 F.3d 1111, 1120

9   (9th Cir. 2013). That presumption is inaccurate if applied to this case. Although the Attorney

10  General's predecessor elected not to appeal or challenge the district court's decision in *Fouke*, the

11  state's current Attorney General has not asked this court to relieve him from the permanent

12  injunction; he argues only that the injunction entered in *Fouke* does not apply. *See* Cal. Mem. at

13  9–10; Cal. Reply at 3. Only the intervenors have asked the court to dissolve or modify the

14  permanent injunction. The court knows of no way the intervenors or anyone in privity with them

15  could have appealed or challenged the injunction in *Fouke*. They do not contend, however, that

16  *Fouke* was wrongly decided, so the court has not considered whether it was. The court asks

17  instead only whether the intervenors have shown "a significant change in facts or law warrants

18  revision or dissolution of the injunction." *Karnoski*, 926 F.3d at 1198 (quoting *Sharp*, 233 F.3d at

19  1170).

20       The intervenors have not satisfied these requirements. Now, as before, section 6(f) of the

21  Endangered Species voids any state laws that "prohibit what is authorized pursuant to an

22  exemption or permit provided for in this chapter or in any regulation which implements" the

23  Endangered Species Act. 16 U.S.C. § 1353(f). Now, as before, regulations adopted under the

24  authority of the Endangered Species Act provide that "[n]o person may take any American

25  alligator," with specific exceptions. *Compare* 50 C.F.R. § 17.42(a)(2)(ii) *with* 50 C.F.R.

26  § 17.42(a)(1)(i)(E) (1977). And now, as before, California Penal Code sections 653o and 653r

27  prohibit takings authorized by those regulations. In short, the facts and the law behind *Fouke v.*

28  *Brown* are the same today as they were in 1979: "California Penal Code Sec. 653o and Sec. 653r

14

1   purport to prohibit what is authorized pursuant to an exemption or permit provided for by the U.S.

2   Endangered Species Act and regulations implementing it."  463 F. Supp. at 1144.

3   　　　Although federal regulations and the status of the American alligator both have changed

4   since *Fouke* was decided, those changes lack "significance" in the sense that would be necessary

5   here.  American alligators are no longer "endangered" or even "threatened," Intervenors' Mem. at

6   8–9, but they still are protected under the Endangered Species Act, as their appearance is similar

7   to that of threatened crocodilians, *see* 50 C.F.R. § 17.42(a).  The administration no longer requires

8   a permit to take, purchase, possess, sell, transfer, or ship alligator products, *see* Intervenors' Mem.

9   at 8 (citing 50 C.F.R. § 17.42(a) (1977)), and imports and exports are now authorized, *see* 50

10  C.F.R. § 17.42(a)(3), but the conflict between these regulations and California law remains.

11  Federal regulations allow people to take American alligators and to buy and sell American

12  alligator products; California law prohibits it.

13  　　　The intervenors also cite a provision in the special rules for American alligators that was

14  added after *Fouke* was decided.  *See* Intervenors' Mot. at 9.  In their view, this provision resolves

15  any conflict between the federal regulations and California law by expressly accepting that

16  California, and any other state, could ban all American alligator products.  *See id.*  The provision

17  they cite conditions federal authorization on compliance "with the laws and regulations of . . . the

18  State or Tribe in which the sale or transfer occurs."  50 C.F.R. § 17.42(a)(2)(ii)(B).

19  　　　In its previous order, this court concluded that this provision presented a serious question.

20  *See* Prelim. Inj. Order at 15.  On its face, it implies that states can impose independent conditions

21  on the sales and transfers of American alligator products—and perhaps even an outright ban.  *See*

22  *id.*  The parties had not adequately explored that possibility in their briefing when the court

23  considered the question before.  *See id.*  They have done so now.  Having reviewed the parties'

24  arguments and the record, the court concludes that contrary to the intervenors' argument, the new

25  provision does not remove this action from the scope of the permanent injunction in *Fouke*.

26  　　　The primary fault in the intervenors' position is the absence of any workable limiting

27  principle.  If they are correct, then federal regulations permit states to pass whatever restrictions

28  they like.  The special rules would effectively short circuit the express preemption in section 6(f).

1   The Ninth Circuit addressed and rejected a very similar argument in *Man Hing*.  A few more

2   details about that case are necessary to explain why.

3          The plaintiff in *Man Hing* was a wholesale importer of African elephant ivory products.

4   *See* 702 F.2d at 761.  The California Penal Code prohibited trade in elephant products.  *See id.* at

5   761–62 (quoting Cal. Penal Code § 653o (1970) and citing 1976 Cal. Stat. 1696).  By contrast,

6   federal regulations adopted under the Endangered Species Act authorized trade in elephant ivory

7   products, provided, again, that all necessary permits were in place.  *See id.* at 763–64 (quoting 50

8   C.F.R. § 17.40(e) (1981)).  The district court concluded the state law was preempted because it

9   prohibited what federal regulations permitted, and the Ninth Circuit affirmed.  *See id.* at 764–65.

10          The Circuit rejected the state's argument that the federal permit was conditional on

11   compliance with the state's own laws.  *See id.* at 765.  Although the permit expressly cautioned

12   that its validity was "conditioned upon strict observance of all applicable foreign, state, and other

13   federal law," the circuit decided this caveat was intended to implement another federal regulation,

14   which required that trade under a federal permit "meet state or federal health, quarantine,

15   customs, and agricultural laws." *Id.* (emphasis omitted) (citing 50 C.F.R. § 10.3 (1981)).  "To

16   read the condition more broadly . . . would open the way for states to impose regulation to

17   supersede federal regulation of trade in imported endangered species or their export or interstate

18   commerce, a form of state preemption clearly contrary to the intent of Congress in passing the

19   Endangered Species Act." *Id.*  A broad reading also would "pave the way for a day when an

20   enterprise . . . could secure a federal permit . . . and yet find itself unable to conduct such trade

21   within the United States because of widespread state adoption of statutes paralleling California's

22   section 653o" *Id.* at 765 n.5.  The Circuit's reasoning is as compelling today as it was when *Man

23   Hing* was decided.  Congress cannot have intended for broad conditions in federal regulations to

24   short circuit the express preemption in section 6(f).  *See id.* at 765 & n.5.

25          In addition, reading the new regulatory condition as the intervenors propose would imply

26   the U.S. Fish & Wildlife Service silently departed from a prior policy in stark "disregard" for the

27   "rules that are still on the books," an outcome the Administrative Procedure Act would prohibit.

28   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  As the plaintiffs persuasively

1  explain, before the current language in the American alligator special rule was adopted, the

2  special rule did not mention the laws and regulations of receiving states, such as California.  *See*

3  Pls.' Mem. at 13–16.  The new language was added after a series of restrictions on American

4  alligator trade was lifted.  *See id.*  If the intervenors' interpretation were correct, then the agency

5  would be permitting states to prohibit trade in a way it never before had done, and it would have

6  done so in the same moment it was lifting trade restrictions.  Federal courts avoid such irrational

7  interpretations of federal regulations when, as in this case, it is possible to use "a more plausible

8  interpretation."  *United States v. Aldana*, 878 F.3d 877, 882 (9th Cir. 2017).

9         The better reading of the new condition in the special rule for American alligators is as a

10  broad requirement to comply with any relevant state health and safety, quarantine, and similar

11  regulations.  Although previous versions of the special rules for American alligators did not

12  include the condition the parties now dispute, the condition's substance is not new.  In 1979, as

13  today, federal regulations made clear that import and export permits did not relieve permit holders

14  of their duties to comply with any applicable statutes and regulations, including state law.  *See* 50

15  C.F.R. § 10.3.  Federal permits issued under the Endangered Species Act reiterated that caution at

16  the time.  *See Man Hing*, 702 F.2d at 765.  This caution is sensible and unsurprising if it is

17  interpreted as a warning that health, safety and similar requirements still apply.  These are animal

18  products, after all.  State health and safety laws do not conflict with the federal regime and have

19  become more salient as restrictions on alligator meat and other products loosened, as plaintiffs

20  persuasively explain.  *See* Pls.' Mem. at 11–16.

21         At oral argument, the intervenors contended their position does not create a loophole or a

22  shortcut around section 6(f) because federal regulators still have power to prevent states from

23  passing whatever laws they like.  For example, the intervenors proposed, federal regulators could

24  again impose a permit requirement, or they could clearly state that an exemption or exception

25  creates a positive right to engage in some specific conduct.  This argument assumes federal

26  regulations do not already create such a right.  Current regulations do just that.  *See* 50 C.F.R.

27  § 17.8(b) ("Except as provided in a special rule in §§ 17.40 through 17.48, any live or dead

28  specimen of a fish or wildlife species listed as threatened under this part may be imported without

1  a threatened species permit under § 17.32 provided that all of the following conditions are met

2  . . . ."); *id.* § 17.42(a) (special rule for American alligators).

3         In sum, the terms of the permanent injunction in *Fouke v. Brown* apply to the plaintiffs'

4  claims regarding American alligator hides.  Neither California nor the intervenors have satisfied

5  the first part of the two-part test for modifying or dissolving an injunction, so the injunction

6  remains in place.

7         **B.     Claims Beyond *Fouke v. Brown***

8         At the same time, in *Fouke*, the court enjoined the enforcement of California Penal Code

9  sections 653o and 653r with respect to American alligator hides only.  *See* 463 F. Supp. at 1145.

10  The plaintiffs in this case assert claims about other products as well, including products made

11  with the hides of Nile and saltwater crocodiles.  For that reason, the court must consider

12  independently whether the Endangered Species Act preempts California Penal Code sections

13  653o and 653r with respect to these species.

14         "Preemption analysis starts with the assumption that the historic police powers of the

15  states were not to be superseded by the Federal Act unless that was the clear and manifest purpose

16  of Congress." *City of Columbus v. Ours Garage and Wrecker Serv., Inc.*, 536 U.S. 424, 438

17  (2002) (alternation, internal quotations and citation omitted).  As a result, "Congressional

18  intent . . . is the ultimate touchstone of preemption analysis." *Engine Mfrs. Ass'n v. S. Coast Air*

19  *Quality Mgmt. Dist.*, 498 F. 3d 1031, 1040 (9th Cir. 2007) (quoting *Tocher v. City of Santa Ana*,

20  219 F.3d 1040, 1045 (9th Cir. 2000), *abrogated in part on other grounds as explained in Tillison*

21  *v. City of San Diego*, 406 F.3d 1126 (9th Cir. 2005)).  When a statute expressly preempts state

22  law, the court "focus[es] on the plain wording of the clause, which necessarily contains the best

23  evidence of Congress' pre-emptive intent." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S.

24  582, 594 (2011).

25         As summarized above, section 6(f) preempts any state law or regulation that "prohibit[s]

26  what is authorized pursuant to an exemption or permit provided for in [the Endangered Species

27  Act] or in any regulation which implements [it]." 16 U.S.C. § 1535(f).  This court concluded in

28  its previous order that the plaintiffs were likely to prevail on their claim that the California Penal

18

1    Code prohibits activities authorized by the special rules for other threatened crocodilians.  *See*

2    Prelim. Inj. Order at 11–15.  The court concludes now that the Penal Code does in fact prohibit

3    what federal regulations authorize.

4         The court begins with the language of section 6(f).  That section uses the word

5    "exemption" as a disjunctive alternative to the word "permit."  *See* 16 U.S.C. § 1535(f).  For that

6    reason, an "exemption" is best understood as a legal provision that relieves a person of an

7    otherwise applicable permit requirement.  *See* Prelim. Inj. Order at 13.  The special rules for other

8    threatened crocodilians fit that definition.  The Endangered Species Act and the administration's

9    regulations generally prohibit trade in Nile and saltwater crocodiles, but under the special rules

10   for other threatened crocodilians, prohibited trade is authorized by a permit or by compliance with

11   CITES, *see supra* at 2–5, subject to the person's compliance with the requirements in other

12   regulations.  *See* Prelim. Inj. Order at 14; *see also* 50 C.F.R. § 17.8(a) ("Except as provided in a

13   special rule . . . , all provisions of §§ 17.31 and 17.32 apply . . . .").  In this way, the strictures of

14   CITES supplant the administration's own permit and create an "exemption."  California prohibits

15   trade in crocodile products in Penal Code sections 653o and 653r, so those sections prohibit what

16   federal regulations authorize and are expressly preempted under section 6(f) of the Endangered

17   Species Act.

18        This interpretation of section 6(f) also follows from several clues about Congress's intent

19   reflected in the Endangered Species Act's legislative history.  According to a House report,

20   preemption was of "great interest" during legislative hearings because the preemptive language

21   that eventually became section 6(f) was "susceptible of alternative interpretations."  *See* H.R.

22   Rep. No. 412, 93rd Cong., 1st Sess. 7 (July 27, 1973).  Under the draft language Congress was

23   then considering, a state law or regulation would be "void to the extent that it would effectively

24   permit or prohibit imports, experts, or transactions in interstate or foreign commerce in a manner

25   inconsistent with" federal law and regulations.  *See* H.R. 4758 § 4(e), 93rd Cong., 1st Sess. (Feb.

26   27, 1973).

27        The phrase "inconsistent with" raised concerns in states whose laws already protected

28   endangered species.  New York was an example.  Its "Mason law" prohibited sales of skins and

1   bodies of several animals, including alligators.  *See* Statement of James P. Corcoran, Assistant

2   Attorney General, State of New York, Hearings before the Subcommittee on Fisheries and

3   Wildlife Conservation of the Committee on Merchant Marine and Fisheries of the U.S. House of

4   Representatives on H.R. 2169 and 4758 at 351, 353 (Mar. 27, 1973) (citing Mason Law, N.Y.

5   Agric. & Mkts. § 358-a (1970)).  A representative of the New York Attorney General explained

6   the State's concern with the proposed preemption to a House subcommittee: "Some of [the]

7   animals [protected by the New York Mason law] are not presently on the Secretary's list, nor is

8   there any certainty that they will be included in the near future."  *Id.* at 352.  "Since all

9   endangered species under the Mason law travel in interstate or foreign commerce to New York,

10  this law would presumably be void except insofar as it precisely followed the Federal law, in

11  which case the State law would be meaningless."  *Id.*  New York thus feared the proposed law

12  would preempt the field entirely.  *Id.*; *see also id.* at 362–63.  The New York Attorney General

13  proposed an amendment clarifying that the Endangered Species Act should not be construed "as

14  superseding or limiting the power of any State to enact legislation more restrictive than the

15  provisions in this act for the protection and conservation of fish and wildlife."  *Id.* at 352.

16      California's Attorney General joined in "strongly recommending" that Congress "allow

17  states to have more restrictive laws to protect endangered species."  *Id.* at 374–75.  He explained

18  that like New York, California protected some species that the administration had not included on

19  its proposed lists of endangered species.  *Id.*  For example, at the time, section 653o of the

20  California Penal Code forbade imports and sales of the bodies and parts of alligators, crocodiles,

21  polar bears, leopards, tigers, wolves, whales and several other animals.  *See id.* at 249–50.  If

22  federal law completely preempted section 653o, and if the federal law did not list all of the

23  species listed in section 653o, those unlisted species might not be protected in California at all.

24  *See id.* at 375.

25      At least one legislator thought this was "a very interesting point" and "ought to be

26  clarified."  *Id.* at 358.  The subcommittee chairman asked the Department of the Interior, which

27  had drafted the original preemption language, for its response.  *See id.* at 387.  In a letter, the

28  administration clarified its position.  "It was not our intention," the administration wrote, to "void

20

State laws, such as New York's Mason Act, which apply to the sale of species *not* appearing on the Federal endangered species lists." *Id.* (emphasis in original).  Nor did the administration wish to "void all State laws which regulate interstate or foreign commerce in endangered or non-endangered species by 'preempting the field' of commercial restraints upon the trade in or movement of such fish and wildlife in interstate or foreign commerce." *Id.*  The administration had no concerns if states wished to regulate takings within their borders more strictly.  *Id.*  But it believed states "should not be permitted to prohibit acts which are *expressly* allowed by a Federal permit or exemption, or to permit what is prohibited by federal law." *Id.* (emphasis in original). In the administration's view, federal law must void any state laws that "thwarted" the federal program of prohibitions and exceptions, especially because the federal programs would implement the United States' obligations under international treaties.  *Id.*

The administration proposed a clarifying revision, and that revision is similar to the final preemptive language in section 6(f).  *Compare id.* at 387–88 *with* 16 U.S.C. § 1535(f).  A House Report explains: "the Committee rewrote the . . . bill to make it clear that states would and should be free to adopt legislation or regulations that might be more restrictive than that of the Federal government and to enforce the legislation," but in cases of "a specific Federal permission for or a ban on importation, exploitation, or interstate commerce," states "could not override the Federal action."  H.R. Rep. No. 412, 93rd Cong., 1st Sess. 7 (July 27, 1973).

Although this legislative history is not decisive, it confirms what the text of section 6(f) clearly implies.  First, if an animal is not listed, states can give greater protections.  Section 6(f) refers only to "what is prohibited" and "what is authorized" by federal law and regulations. Second, when an animal is listed, states can regulate takings within their borders.  They can also "conserve" wildlife within their borders if their laws and regulations are more restrictive than federal laws and regulations, but only within their borders.  Section 6(f) refers to "migratory, resident, or introduced fish or wildlife" and "takings," not foreign, non-native animals.  But third, section 6(f) expressly and unambiguously voids state laws and regulations that conflict with federal regulation of interstate and foreign commerce.

1        By prohibiting all trade in crocodile products, California Penal Code section 653o falls on

2   the preempted side of each of these three divisions.  First, California is regulating crocodile

3   species on the "threatened" list.  Second, California is not regulating crocodile takings within its

4   borders.  Nothing in the record suggests crocodiles reside in California, migrate into California or

5   have been introduced into California.  Third, section 653o applies expressly to interstate and

6   foreign commerce by barring "imports," thus encroaching on a federal system of permits and

7   exemptions that implements CITES, an international treaty.

8        This conclusion withstands the state's and the intervenors' counterarguments.  California

9   argues again that section 653o can and should be interpreted as applying only to trade within the

10  state—not to "interstate commerce"—and thus is not preempted.  *See, e.g.*, Cal. Mem. at 9–10.  In

11  the state's view, this interpretation obviates a constitutional question.  *See id.*  But that is not so

12  clear to this court.  The state's argument still relies on a comparison of federal law and

13  regulations, and that comparison is at the core of determining express preemption.  *See Whiting*,

14  563 U.S. at 594.  Even if the state's interpretation does sidestep a constitutional question, the

15  court could not adopt that interpretation.  For the reasons in the previous section, section 653o

16  cannot reasonably be interpreted as applying only to trade within the state's borders, *see supra* at

17  11–13, so the doctrine of constitutional avoidance is no aid.  *See Nielsen v. Preap*, 139 S. Ct. 954,

18  972 (2019) ("[C]onstitutional avoidance 'comes into play only when, after the application of

19  ordinary textual analysis, the statute is found to be susceptible of more than one construction.'"

20  (citation and quotation marks omitted)).

21       The intervenors, by contrast, accept that section 653o regulates interstate commerce, but

22  argue the special rules do not create "exemptions" under express preemption in section 6(f).

23  They contend the word "exemption" in section 6(f) refers to several categorical exemptions and

24  exceptions listed in 16 U.S.C. § 1539.  *See, e.g.*, Intervenors' Mem. at 17–18.  It is improbable

25  that Congress intended section 6(f) as a cross-reference to § 1539 only.  If Congress had intended

26  to use "exemption" as a defined term and a reference to specific provisions in § 1539, it would

27  likely have added a cross reference in section 6(f), or it could have included the word

28  "exemption" in the Endangered Species Act's list of definitions.  *See* 16 U.S.C. § 1532.  Defining

the word "exemption" by cross-reference to § 1539 would also artificially limit the plain language of section 6(f), which refers not only to "this chapter" but also to "any regulation which implements this chapter."

In addition, the intervenors advance several arguments highlighting the traditional role of the states in protecting wildlife.  *See, e.g.*, Intervenors' Mem. at 10–11 (arguing section 6(f) should be interpreted narrowly to preserve states' traditional police powers); *id.* at 11–12 (arguing Congress intended to preserve stricter state regulations of trade in listed species).  The legislative history summarized above demonstrates Congress was aware of these interests and intended to preserve states' roles.  But that history also shows how Congress limited the states' roles.  In addition to states' traditional interests, traditional federal interests were at stake: the regulation of interstate and foreign commerce and international treaties.  *See, e.g.*, U.S. Const. Art. I, § 8, cl. 3 (Commerce Clause); *id.* Art. II, § 2, cl. 2 (Treaties Clause).  Congress balanced these competing interests in section 6(f) and expressly preempted conflicting state laws and regulations, as explained above.

It may be, as the intervenors contend, that Congress intended to return traditional regulatory authority to the states as wildlife populations rebounded.  *See* Intervenors' Mem. at 10–14.  As the Ninth Circuit recognized in *Man Hing*, when federal protections wane, state regulations could potentially become stricter.  *See* 702 F.2d at 765 n.4.  The Supreme Court also recognized long before the Endangered Species Act that "[p]rotection of the wild life [sic] of the state is peculiarly within the police power, and the state has great latitude in determining what means are appropriate for its protection." *Lacoste v. Dep't of Cons. of State of La.*, 263 U.S. 545, 551 (1924)).  The plaintiffs have shown, however, that Congress intended to preempt state laws that prohibit interstate and foreign trade when federal regulations authorize that trade, and they have shown that California Penal Code section 653o and 653r run afoul of that express preemption.

This is not to say the plaintiffs' conception of section 6(f) is free of counterintuitive implications.  The Ninth Circuit explained one potentially counterintuitive result in *Man Hing*.  If an animal is listed as endangered or threatened under federal law and regulations, but importers

1     can obtain a federal trade permit, then states could not prevent imports.  *See Man Hing*, 702 F.2d

2     at 765 n.4.  If, however, the animal were not endangered or threatened—and, as a result, no

3     federal permit were necessary—a state could ban trade outright.  *See id.*  That is, animals that are

4     *not* listed on the endangered and threatened lists could be afforded *greater* protection than

5     animals *on* the list.  *See id.*  This anomaly came into full relief in *H.J. Justin*.  In that case, the

6     plaintiff importer wished to sell products made from the hides of African elephants, Indonesian

7     pythons and Wallaby kangaroos in California, but again, section 653o banned those sales.  702

8     F.2d at 759.  Under *Man Hing*, the Circuit determined the state's ban on elephant hide imports

9     was preempted.  *Id.*  By contrast, Indonesian pythons and Wallaby kangaroos were not listed as

10    "endangered" or "threatened" species, so California could prohibit all imports without running

11    afoul of section 6(f).  *See id.* at 759–60.

12          Perverse incentives are not difficult to see in this potentially counterintuitive system.

13    Those who traffic in vulnerable wildlife may be perfectly content for their targets to remain

14    "threatened" in the eyes of a federal regulator, if that means state markets remain open to them.

15    Despite these potential anomalies, the Ninth Circuit concluded the terms of section 6(f) were

16    clear.  *See id.*; *see also Man Hing*, 702 F.2d at 765 n.4.  This court agrees.  Section 6(f) expressly

17    preempts California Penal Code sections 653o and 653r.  For that reason, the court need not and

18    does not decide whether the Endangered Species Act impliedly preempts those sections as well.

19    *See* Delacroix Mem. at 14–17 (advancing that argument).

20    **IV.    CONCLUSION**

21          The court **grants** plaintiffs' cross-motions for summary judgment in the consolidated

22    case.  The court **denies** state's and intervenors' cross-motions.  This order does not grant any

23    party's request for a remedy.  Within **twenty-eight days**, the parties shall meet and confer and

24    file a joint report proposing a schedule for the final resolution of this matter, including the

25    determination of any appropriate remedies.

26          The court notes Case No. 2:19-cv-02471-KJM-CKD and Case No. 2:19-cv-02488-KJM-

27    CKD were consolidated into Case No. 2:19cv02471-KJM-CKD on October 13, 2020, however,

28    Case No. 2:19cv02488-KJM-CKD was not closed.  The court directs the clerk's office to close

1   Case No. 2:19-cv-02488-KJM-CKD, and all future documents filed in the consolidated case shall

2   be filed only in case No. 2:19-cv-02471-KJM-CKD.

3       This order resolves ECF Nos. 65, 66 and 67 in case No. 19-2471 and ECF No. 54 in case

4   No. 19-2488.

5       IT IS SO ORDERED.

6   DATED:  March 6, 2023.

7

8

                                               CHIEF UNITED STATES DISTRICT JUDGE